1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

9

EASTERN DISTRICT OF CALIFORNIA

10

11                                  ----oo0oo----

12

CONSERVATION CONGRESS,                    CIV. NO. 2:15-00249 WBS AC

13            Plaintiff,

MEMORANDUM AND ORDER RE: CROSS-
14       v.                               MOTIONS FOR SUMMARY JUDGMENT

15

UNITED STATES FOREST SERVICE,
16  and UNITED STATES FISH AND
WILDLIFE SERVICE,
17

            Defendants.
18

19                                  ----oo0oo----

20

        Plaintiff Conservation Congress brought this action

21

against the United States Forest Service ("Forest Service") and

22

the United States Fish and Wildlife Service ("FWS"), alleging

23

that defendants violated the National Environmental Policy Act

24

("NEPA"), 42 U.S.C. §§ 4321-4347, the Endangered Species Act

25

("ESA"), 16 U.S.C. §§ 1531-1544, the National Forest Management

26

Act of 1976 ("NFMA"), 16 U.S.C. §§ 1600-1614, and the

27

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, in

28

                                    1

1   approving the Harris Vegetation Management Project ("Harris

2   Project") in the Shasta-Trinity National Forest.  Pursuant to

3   Federal Rule of Civil Procedure 56, plaintiff and defendants both

4   move for summary judgment.  (Docket Nos. 32, 41.)

5   I.   Factual and Procedural Background

6        Plaintiff Conservation Congress is a non-profit

7   corporation dedicated to maintaining, protecting, and restoring

8   the native ecosystems of northern California.  (Second Am. Compl.

9   ("SAC") ¶ 9 (Docket No. 10).)  Plaintiff has an organizational

10  interest in the lawful management of National Forests in northern

11  California.  (Id.)

12       Defendant Forest Service, an agency of the United

13  States Department of Agriculture, is responsible for the

14  administration and management of the federal lands at issue in

15  this case and compliance with NEPA and NFMA.  Defendant FWS, an

16  agency within the United States Department of Interior, is

17  charged with administering the ESA.

18       According to the Forest Service, the Harris Project is

19  designed to improve forest health and restore fire-adapted

20  ecosystem characteristics on approximately 2,800 acres of

21  National Forest System Land within the 9,200 acre project area in

22  the Shasta-Trinity National Forest in Siskiyou County.  (Admin.

23  R. ("AR") at 1045.)  Due to prior forest management activity,

24  including railroad logging in the early 1900s and intensive fire

25  suppression, the forest currently has overly dense forest stands.

26  (Id. at 1048.)  As a result, too many trees are competing for

27  sunlight, water, and nutrients and the trees are more susceptible

28  to drought, disease, insect infestation, and mortality.  (Id.)

2

1   The stated purposes of the Harris Project are to improve the

2   health and growth of forest stands, develop late-successional

3   habitat, reduce fuel loading to levels where predicted fires will

4   not destroy the forest stands, encourage the growth of hard

5   woods--especially aspen and oaks that are subject to competition

6   from conifers, and reduce open road density.  (Id.)   The Forest

7   Service will thin overstocked forest stands by removing

8   understory, mid-story, and some dominant trees; diseased and

9   dying trees; and residual wildfire fuels like branches and bark.

10   (Id. at 1049-50.)   The timber harvest associated with the

11   treatment will yield 3,392,345 cubic feet of merchantable sawlogs

12   and 215,172 cubic feet of merchantable biomass.   (Id. at 1309.)

13   To determine the predicted effects of the Harris Project's

14   alternatives on threatened and endangered species, the Forest

15   Service prepared a Biological Assessment ("BA") and an

16   Environmental Impact Statement ("EIS") that incorporated the BA

17   by reference.  (Id. at 1336.)

18        In its SAC, plaintiff alleges the Harris Project

19   violates the APA, NEPA, NFMA, and ESA because of the adverse

20   effects it will have on the threatened northern spotted owl and

21   the endangered gray wolf.  (SAC ¶¶ 22-29.)  Plaintiff first

22   alleges defendants violated NEPA and the APA by failing to (1)

23   adequately analyze and disclose the cumulative effects of the

24   Harris Project on the northern spotted owl and other wildlife

25   species; (2) prepare a supplemental EIS in light of significant

26   new information on the effectiveness of fuel treatments; (3) take

27   a hard look at the environmental impacts on late-successional

28   forests, the black-backed woodpecker, the northern spotted owl,

1   and the ecological benefits of natural disturbances; and (4)

2   respond to responsible, opposing scientific opinions.  (Id. ¶¶

3   44-71.)

4        Plaintiff next alleges defendants violated NFMA and the

5   APA by failing to (5) maintain dead or down material, hardwoods,

6   and snags at naturally occurring levels; and (6) maintain habitat

7   for threatened, endangered, and sensitive species consistent with

8   the species' individual recovery plans.  (Id. ¶¶ 72-84.)

9        Lastly, plaintiff alleges the Forest Service violated

10  the ESA and APA by failing to adequately analyze and disclose in

11  its BA the potential for adverse effects (7) on the northern

12  spotted owl and (8) the gray wolf.  (Id. ¶¶ 85-97.)  Plaintiff

13  also alleges the FWS violated the ESA and APA by (9) concurring

14  in the Forest Service's determination that the Harris Project

15  would not adversely affect the northern spotted owl; and (10)

16  failing to require the Forest Service to conduct adequate surveys

17  to determine if the gray wolf was present in the project area.

18  (Id. ¶¶ 98-109.)

19       Plaintiff requests the court vacate and remand the EIS,

20  BA, FWS Concurrence Letter, and Record of Decision ("ROD") and

21  enjoin timber harvest in the Harris Project until defendants

22  comply with NEPA, NFMA, and ESA.  (Id. ¶¶ 115-16.)  Plaintiff

23  also requests reasonable fees, costs, and expenses pursuant to

24  the Equal Justice Act, 28 U.S.C. § 2412.  (Id. ¶ 117.)

25       Presently before the court is plaintiff's motion and

26  defendants' cross-motion for summary judgment.  (Docket Nos. 32,

27  41.)

28  II.  Discussion

4

A. <u>Standing</u>

Defendants do not contest plaintiff's standing.  Denise Boggs, the executive director of Conservation Congress, states in her declaration that she regularly visits the Shasta-Trinity National Forest to hike, view wildlife, take photographs, and bird watch.  (Boggs Decl. ¶ 4 (Docket No. 34).)  Boggs specifically visited the Harris Project site and looked for raptors and their nests in the large old growth trees and snags. (<u>Id.</u> ¶ 5.)  She has concrete plans to return to the Harris Project area again in September 2016.  (<u>Id.</u>)  Boggs is concerned the Harris Project will harm her ability to enjoy and hike "through the area in an unimpaired state . . . looking for raptors, woodpeckers, songbirds, and owls." (<u>Id.</u> ¶ 8.)  In addition, Boggs worries the Harris Project will have adverse effects on avian species, wolves, furbearers, northern spotted owls, large and old growth trees, and the other species she and the Conservation Congress members work to protect.  (<u>Id.</u>)  These facts are sufficient to confer standing on plaintiff to bring this suit.  <u>See</u> <u>Ocean Advocates v. U.S. Army Corps of Eng'rs</u>, 402 F.3d 846, 859-62 (9th Cir. 2005) (discussing standing requirements in the context of suits under NEPA).

B. <u>Standard of Review</u>

Judicial review of actions by administrative agencies is governed by the APA.  Under the APA, the reviewing court must set aside agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  This is a "deferential standard . . . designed to ensure that the agency considered all of the relevant

1    factors and that its decision contained no clear error of

2    judgment." Pac. Coast Fed'n of Fishermen's Ass'n v. Nat'l Marine

3    Fisheries Serv., 265 F.3d 1028, 1034 (9th Cir. 2001) (citation

4    omitted).  An agency action should be overturned only when the

5    agency has "relied on factors which Congress has not intended it

6    to consider, entirely failed to consider an important aspect of

7    the problem, offered an explanation for its decision that runs

8    counter to the evidence before the agency, or is so implausible

9    that it could not be ascribed to a difference in view or the

10   product of agency expertise." Id. (citation omitted).  The court

11   must ask whether an agency considered "the relevant factors and

12   articulated a rational connection between the facts found and the

13   choice made." Nat'l Res. Def. Council v. U.S. Dep't of the

14   Interior, 113 F.3d 1121, 1124 (9th Cir. 1997) (citation omitted).

15          The court is not empowered to substitute its judgment

16   for that of an agency. Ariz. Cattle Growers' Ass'n v. U.S. Fish

17   & Wildlife Serv., 273 F.3d 1229, 1236 (9th Cir. 2001) (citing

18   Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402,

19   416 (1971)).  The court defers to an agency's "interpretation of

20   its own regulations . . . unless plainly erroneous or

21   inconsistent with the regulations being interpreted." Ctr. for

22   Biological Diversity v. U.S. Forest Serv., 706 F.3d 1085, 1090

23   (9th Cir. 2013) (citation omitted).

24          The court should review an agency's actions based on

25   the administrative record presented by the agency. See Ctr. for

26   Biological Diversity v. U.S. Fish & Wildlife Serv., 450 F.3d 930,

27   943 (9th Cir. 2006).  The court's role is "to determine whether

28   or not, as a matter of law, the evidence in the administrative

record permitted the agency to make the decision it did."

Nehemiah Corp. v. Jackson, 546 F. Supp. 2d 830, 838 (E.D. Cal.

2008); see also Occidental Eng'g, Co. v. INS, 753 F.2d 766, 769-

70 (9th Cir. 1985).

C. National Environmental Policy Act Claims

NEPA is "our basic national charter for protection of

the environment.  It establishes policy, sets goals . . . and

provides means for carrying out the policy."  40 C.F.R.

§ 1500.1(a).  NEPA "does not set out substantive environmental

standards, but instead establishes 'action-forcing' procedures

that require agencies to take a 'hard look' at environmental

consequences."  Metcalf v. Daley, 214 F.3d 1135, 1141 (9th Cir.

2000) (citations omitted).  NEPA established the Council on

Environmental Quality ("CEQ"), 42 U.S.C. § 4342, which

promulgated regulations to govern NEPA compliance.

When a major federal action may affect the environment,

NEPA requires the acting agency to undergo a scoping process in

which it solicits comments and input from the public and other

agencies to identify specific issues to address and study.  40

C.F.R. § 1501.7.  An EA shall be prepared when the agency has not

yet determined whether an EIS is necessary and must discuss the

need for the proposed project, alternatives, and the

environmental impacts of the proposed action and alternatives.

Id. § 1508.9; 36 C.F.R. § 220.7.  If the agency determines that

an EIS is necessary, 40 C.F.R. § 1501.4, it drafts an EIS and

presents it to the public for notice and comment, id. §

1503.1(a).  The EIS "shall provide full and fair discussion of

significant environmental impacts and shall inform decisionmakers

1   and the public of the reasonable alternatives which would avoid

2   or minimize adverse impacts or enhance the quality of the human

3   environment." Id. § 1502.1.  After the Forest Service evaluates

4   and responds to comments, it prepares a Final EIS and provides a

5   pre-decisional objection period before issuing its record of

6   decision.  Id. §§ 1502.9(b), 1502.2; 36 C.F.R. Pt. 218.

7           1. Impacts on the Northern Spotted Owl

8           Plaintiff alleges that the Forest Service violated NEPA

9   because it failed to take a "hard look" at the impacts of the

10  Harris Project on the northern spotted owl.  (Pl.'s Mem. at 26-28

11  (Docket No. 33).)  Specifically, plaintiff contends the Harris

12  Project is managing the forest towards a ponderosa pine habitat--

13  a habitat type that is unsuitable for the northern spotted owl--

14  and the BA and EIS fail to candidly explain how this shift will

15  impact the northern spotted owl.  (Id. at 27-28.)

16          The court's task under NEPA "is to ensure that the

17  agency has taken a 'hard look' at the potential environmental

18  consequences of the proposed action." Klamath-Siskiyou Wildlands

19  Ctr. v. Bureau of Land Mgmt., 387 F.3d 989, 993 (9th Cir. 2004).

20  "Although an agency's actions under NEPA are subject to careful

21  judicial scrutiny, courts must also be mindful to defer to agency

22  expertise, particularly with respect to scientific matters within

23  the purview of the agency." Id.  The standard of review is

24  narrow.  Id.

25          In comparing the alternative action plans in the

26  Silviculture Report, the Forest Service found that "Alternative

27  1, 4a and 4b overall represent the most aggressive and effective

28  treatment actions to advance stand conditions towards the

objectives" of improving forest health and growth, developing late-successional forest, and maintaining aspen and oak.  (AR at 7981-82.)  These "alternatives provide the greatest reduction in stand density levels both in the short and long term as well as most pronounced shift in species composition towards pine."  (Id. at 7982.)

In the BA, the Forest Service discusses how thinning and the shift in species composition towards pine may impact the northern spotted owl.  The BA makes clear that the highest-quality nesting/roosting habitat will not be treated and, as a result, species composition will not be affected in these areas.  (Id. at 8816.)

In the moderate-quality foraging habitat, the BA explains that forest stands currently have a "higher proportion of mixed conifer composition and white fir dominance; larger tree size; snags and down wood; higher canopy cover; mid and understory layering; but low to no hardwood diversity and few openings."  (Id. at 8866.)  The thinning "will result in increased resilience of the legacy" sugar and ponderosa pine and increased sunlight and openings "for a second age class of natural fir regeneration and understory."  (Id.)  This is expected "to contribute to within-stand heterogeneity while maintaining the function of foraging and dispersal habitat for NSOs."  (Id.)  Further, the BA explains that the Forest Service will refrain from thinning in units 26, 56, 133, or 200 "in order to maintain understory layering and vertical structures for prey species, thermoregulation and perching structures."  (Id.)  The Forest Service will also retain untreated areas within treated

units in order to "contribute to the persistence of high-quality components of roosting, foraging, and dispersal." (Id.)  Thus, the BA makes clear that while the Harris Project will increase the prevalence of ponderosa pine overall, it will also promote heterogeneous tree species and other important habitat elements in moderate-quality foraging habitat.

In the existing "lower-quality foraging habitat," the BA explains that the forest stands currently have "a mix of 30-70 year-old multi-layered ponderosa pine/white fir and even aged (40 year old), one to two-layered stands dominated by ponderosa pine, pockets of young and mature lodgepole pine, and incidental sugar pine." (Id. at 8868.)  These units are lower-quality habitat because of the higher proportion of pine and the limited proximity to other suitable habitat. (Id.)  The BA acknowledges that "[d]ue to favoring ponderosa pine over white fir and lodgepole when thinning in units 25, 44 and 181, changes to the understory and midstory species composition are expected over the long term." (Id.)  However, the BA also states that "not all white fir would be removed and these stands are still expected to provide foraging (and dispersal) opportunities for NSOs." (Id.)  Treatments "will retain sufficient structural elements and species composition that will continue to provide NSO foraging opportunities within these lower quality stands and habitat function will not be precluded." (Id.)

More than forty pages of the BA and sixty pages of the EIS are dedicated to discussing the northern spotted owl and the means the Forest Service has taken to limit any adverse effects on the listed species.  The BA acknowledges that "[t]hinning and

10

1  fuels treatments are expected to result in variable short-term

2  effects to foraging habitat quality due to reductions in canopy

3  cover and layering, shrub cover, snags, down logs, and coarse

4  wood." (Id. at 8895.)  However, the Forest Service concludes

5  that the long-term effects will be beneficial. (Id.)

6       The Forest Service explains its reasoning and there

7  appears to be a rational connection between the facts found about

8  the northern spotted owl foraging and dispersal habitat and the

9  conclusions regarding thinning and species composition in those

10  areas. See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm

11  Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) ("[T]he agency must

12  examine the relevant data and articulate a satisfactory

13  explanation for its action including a rational connection

14  between the facts found and the choice made." (citation

15  omitted)).  Given the highly deferential standard of review under

16  the APA, the court must find that the Forest Service fulfilled

17  its obligation to take a "hard look" at the impacts of the Harris

18  Project on the northern spotted owl.

19       2. Response to Opposing Scientific Opinions

20       Plaintiff next argues the Forest Service violated NEPA

21  by failing to address and respond to reasonable opposing

22  scientific views. (Pl.'s Mem. at 28.)  Plaintiff contends the

23  Forest Service should have issued a supplemental EIS to address a

24  recently published study by Jamie M. Lydersen, which found that

25  fire-regimes are not effective in preventing severe fires.

26  Plaintiff argues the Lydersen study calls into question the

27  effectiveness and reasonableness of thinning the Harris Project

28

11

1    area in order to reduce the risk of stand-replacing fires.  (Id.

2    at 30.)

3           In the Final EIS, the acting agency is required to

4    respond to comments and "discuss at appropriate points . . . any

5    responsible opposing view which was not adequately discussed in

6    the draft statement and shall indicate the agency's response to

7    the issues raised."  40 C.F.R. § 1502.9(b).

8           For example, in Center for Biological Diversity v.

9    United States Forest Service, 349 F.3d 1157, 1169 (9th Cir.

10   2003), the Ninth Circuit remanded the Final EIS to the Forest

11   Service because it failed to disclose and discuss responsible

12   opposing scientific viewpoints in violation of NEPA.  The Forest

13   Service's action plan rested on the assumption that northern

14   goshawks were habitat generalists yet the Final EIS failed to

15   disclose or respond to seven scientific studies submitted during

16   scoping that contradicted this assumption.  Id. at 1161, 1167.

17   The Forest Service's inclusion in the administrative record of

18   intra-office memoranda prepared after the issuance of the Final

19   EIS addressing the seven studies and responding to plaintiffs'

20   comments was insufficient.  Id. at 1169.  The Ninth Circuit found

21   that "[b]ecause the commenters' evidence and opinions directly

22   challenge the scientific basis upon which the Final EIS rests and

23   which is central to it, we hold that Appellees were required to

24   disclose and respond to such viewpoints in the final impact

25   statement itself."  Id. at 1167; see also Sierra Club v.

26   Bosworth, 199 F. Supp. 2d 971, 980 (N.D. Cal. 2002) (finding it

27   is not adequate to "merely include scientific information in the

28   administrative record"); Blue Mountains Biodiversity Project v.

1   <u>Blackwood</u>, 161 F.3d 1208, 1214 (9th Cir. 1998) (finding EA must

2   reference support and opposition to Forest Service's

3   conclusions).

4           In this case, the BA was issued on September 9, 2013

5   and the Final EIS on July 1, 2014.  It was not until a month

6   later, on August 26, 2014, that plaintiff submitted an objection

7   to the Harris Project and attached a pre-publication copy of the

8   Lydersen study.  (<u>See</u> AR at 127.)  Unlike in <u>Center for</u>

9   <u>Biological Diversity</u>, the study was unavailable at the time the

10  EIS was issued and could not have been included.  Rather than

11  issue a supplemental EIS, as plaintiff contends was necessary,

12  the Forest Service responded to the Lydersen study by drafting an

13  internal memorandum.  (<u>Id.</u> at 9259.)

14          An agency must "prepare supplements to either draft or

15  final environmental impact statements if" there are "significant

16  new circumstances or information relevant to environmental

17  concerns and bearing on the proposed action or its impacts."  40

18  C.F.R. § 1502.9(c)(1)(ii).  "This reflects the paramount

19  Congressional desire to internalize opposing viewpoints into the

20  decision-making process to ensure that an agency is cognizant of

21  all the environmental trade-offs that are implicit in a

22  decision."  <u>California v. Block</u>, 690 F.2d 753, 771 (9th Cir.

23  1982).  However, while "NEPA requires agencies to allow the

24  public to participate in the preparation of an SEIS, there is no

25  such requirement for the decision <u>whether</u> to prepare an SEIS."

26  <u>Friends of Clearwater v. Dombeck</u>, 222 F.3d 552, 560 (9th Cir.

27  2000).  The Ninth Circuit has made clear that public comment "is

28  not essential every time new information comes to light after an

EIS is prepared" for if it were "to hold otherwise, the threshold
decision not to supplement an EIS would become as burdensome as
preparing the supplemental EIS itself." Id.

In its internal memorandum, the Forest Service
acknowledged Lydersen's finding that "even in forests with a
restored fire regime, wildfires can produce large-scale, high-
severity fire effects under the type of weather conditions that
often prevail when wildfire escapes initial suppression efforts."
(AR at 9260.)  The agency concluded, however, that this finding
does not contradict the scientific evidence cited in support of
the Harris Project for two reasons.  First, Lydersen examined
fire behavior in 90th percentile weather conditions.  The EIS, in
contrast, suggests the treatment alternatives would reduce flame
lengths and result in less active fire crowns in weather
conditions under the 90th percentile. (Id. at 9260, 1334.)

Second, the Harris Project only sets out to moderate
fire behavior for the next ten years and Lydersen's study
actually acknowledges that fire-regimes are effective in such
short-term timeframes.  Lydersen found that plots treated within
fourteen years "'burned predominately at low severity despite
recent drought conditions, suggesting that forests with restored
frequent-fire regimes are resilient to wildfire under less-than-
extreme fire weather conditions.'" (Id. at 9259-60.)  The
memorandum therefore concluded that "the key findings presented"
in Lydersen's study "do not contradict the information presented
in the fire and fuels analysis for the Harris Vegetation
Management Project." (Id. at 9262.)

1    In the final ROD, which was circulated to the public,

2 Forest Supervisor David R. Myers explained that the Lydersen

3 study had been reviewed and addressed by the Forest Service in

4 the internal memorandum included in the administrative record.

5 (Id. at 1058-59 n.7.)  He concluded, "As the responsible

6 official, I fully considered the Lydersen paper/review.  The

7 information in this article did not change the Harris analysis or

8 conclusions."  (Id.)

9    The court must therefore defer to the Forest Service's

10 finding that the Lydersen study did not constitute significant,

11 new, or opposing information that required a supplemental EIS.

12 40 C.F.R. § 1502.9(c)(1)(ii); Marsh v. Or. Natural Res. Council,

13 490 U.S. 360, 377-78 (1989) (finding that the court must defer to

14 "the informed discretion of the responsible federal agencies" on

15 the factual question of whether new information suffices to

16 establish a "significant effect" requiring a supplemental EIS).

17 The agency considered the Lydersen study in its internal

18 memorandum and the ROD and made a reasoned decision that it did

19 not change the Harris analysis or conclusions.

20    Accordingly, the court must deny plaintiff's motion for

21 summary judgment and grant defendants' cross-motion on

22 plaintiff's NEPA claims.

23    D. Endangered Species Act Claims

24    The ESA was enacted "to provide a means whereby the

25 ecosystems upon which endangered species and threatened species

26 depend may be conserved, [and] to provide a program for the

27 conservation of such endangered species and threatened species."

28 16 U.S.C. § 1531(b).  ESA section 4 provides for the listing of

15

1   species as "threatened" or "endangered," the designation of

2   "critical habitat," and the development of "recovery plans" for

3   listed species.  Id. § 1533.

4        Under section 7(a)(2) of the ESA, each federal agency,

5   in consultation with the FWS, must ensure that its actions are

6   "not likely to jeopardize the continued existence of any

7   endangered species or threatened species or result in the

8   destruction or adverse modification of habitat of such species."

9   Id. § 1536(a)(2).  In fulfilling this obligation, each agency

10  must use "the best scientific and commercial data available."

11  Id.

12       If listed species are present in the proposed action

13  area, the Forest Service may conduct a BA to evaluate the

14  potential effects on listed species and critical habitat.  Id.

15  § 1536(c)(1); 50 C.F.R. § 402.12.  The Forest Service then

16  submits the BA to the FWS.  50 C.F.R. § 402.12(j).  If the Forest

17  Service concludes that no listed species are likely to be

18  adversely affected and the FWS concurs, formal consultation is

19  not required.  Id. § 402.12(k)(1).

20       1.   ESA Challenges to the Gray Wolf Determination

21       Plaintiff argues in its SAC that defendants violated

22  the ESA by arbitrarily and capriciously determining that

23  Alternative 4b would not affect the gray wolf.  However, in

24  plaintiff's reply memorandum, plaintiff admits that its gray wolf

25  claims were mooted when the Forest Service reinitiated ESA

26  section 7 consultation and issued a BA Addendum in October 2015,

27  which found that the Harris Project "may affect, but is not

28  likely to adversely affect" the gray wolf, and the FWS concurred.

1   (Pl.'s Reply at 2; see also Defs.' Mem. at 13 (Docket No. 41-1).)

2   Accordingly, the court must dismiss as moot plaintiff's ESA

3   challenges to defendants' gray wolf determination.[1]

4        2.   ESA Challenges to the Northern Spotted Owl

5             Determination

6        Plaintiff also argues the Forest Service's conclusion

7   that Alternative 4b "may affect, but is not likely to adversely

8   affect" the northern spotted owl in its BA and the FWS's

9   concurrence in this determination were arbitrary and capricious

10  and a violation of the ESA.  (Pl.'s Mem. at 4.)

11       Plaintiff first argues the Forest Service failed to

12  consider the adverse effects of degrading foraging habitat within

13  an already spatially-deficient home range.  (Id. at 6-7.)  While

14  the BA acknowledges that the ST-218 northern spotted owl home

15  range is below the recommended threshold by approximately 276

16  acres, (AR at 8855), plaintiff alleges it does not address how

17  losing an additional 17 acres of foraging habitat could

18  exacerbate the adverse effects from spatial deficiency, (Pl.'s

19  Mem. at 7).

20       Degrade is a term of art defined by the BA as

21  signifying "when treatments have a negative influence on the

22  quality of habitat due to the removal or reduction of NSO habitat

23

24       [1]   Because claims eight and ten are moot, the court need
25  not rule on plaintiff's request for judicial notice of two
    exhibits regarding the gray wolf, (Docket No. 37), or whether to
26  admit Ogden's declaration into evidence with its attached extra-
    record evidence, (Docket No. 35).  Defendants withdrew their
27  motion to strike these six extra-record documents because
    plaintiff admitted claims eight and ten are moot.  (Docket No.
28  47.)

elements but <u>not to the degree where existing habitat function is</u> <u>changed</u>."  (AR at 8863); <u>see also</u> <u>Conservation Cong. v. U.S.</u> <u>Forest Serv.</u>, Civ. No. S-11-2605 LKK EFB, 2012 WL 2339765, at *12 (E.D. Cal. June 19, 2012), <u>aff'd</u>, 720 F.3d 1048 (9th Cir. 2013). Degrade therefore does not signify that the habitat will be "downgraded," meaning it will not function in the capacity that exists pre-treatment, or "removed," meaning it will no longer function as habitat suitable for northern spotted owl.  (<u>Id.</u> at 8863-64.)  The northern spotted owl will be able to continue to feed, shelter, or disperse within the degraded portions of ST-218.  (Defs.' Mem. at 23.)  The Forest Service therefore did not discuss the <u>loss</u> of 17 acres of foraging habitat because it will only be "temporarily degraded" in the short-term of fifteen to twenty years and will continue to function as habitat.  (<u>Id.</u>; AR at 8863.)  The court therefore finds that the Forest Service did not violate the ESA by mentioning the spatial-deficiency but failing to characterize the Harris Project treatment as exacerbating the deficiency.

Plaintiff next contends the BA violated the ESA by failing to comply with the northern spotted owl Recovery Plan and, more specifically, Recovery Action 10.  (Pl.'s Mem. at 10.) Plaintiff argues that the BA adopts an overly aggressive management approach and fails to explain why the long-term benefits of treating foraging and dispersal habitat within the ST-218 home range and dispersal habitat within the ST-222 home range outweigh the short-term adverse effects.  (<u>Id.</u> at 12-13.)

Recovery plans describe "site-specific management actions as may be necessary to achieve the plan's goal for the

1   conservation and survival of the species"; objective, measurable

2   criteria for when a species should be removed from the list; and

3   estimates of the time and costs required.  16 U.S.C.

4   § 1533(f)(2).  "While useful in evaluating an action's impact on

5   the species' recovery, recovery plan objectives are discretionary

6   for federal agencies."  Conservation Cong. v. Heywood, Civ. No.

7   2:11-2250 MCE CMK, 2015 WL 5255346, at * 1 (E.D. Cal. Sept. 9,

8   2015) (citation omitted); Conservation Cong. v. Finley, 774 F.3d

9   611, 614 (9th Cir. 2014).

10          In this case, the northern spotted owl Recovery Plan

11  identifies three main threats to the northern spotted owl--

12  "competition from barred owls, past habitat loss, and current

13  habitat loss"--and outlines a management approach to address

14  these threats.  (AR at 31341.)  Recovery Action 10 directs the

15  agency to "[c]onserve spotted owl sites and high value spotted

16  owl habitat to provide additional demographic support to the

17  spotted owl population."  (Id. at 31342.)  However, Recovery

18  Action 10 also provides that long-term improvements to northern

19  spotted owl habitat should be encouraged, even if there are

20  short-term disadvantages: "forest stands could and should be

21  enhanced or developed through vegetation management activities to

22  improve long-term habitat conditions, or to create improved

23  habitat for spotted owls, larger habitat patches, or increased

24  connectivity between patches, they should generally be encouraged

25  even if they result in short-term impacts to existing spotted

26  owls."  (Id. at 31343.)

27          The Harris Project aims to increase forest stand

28  resilience to stressors such as drought, insects, and fire in

1  order to maintain existing habitat used by the northern spotted

2  owl in the short-term and contribute to resilience of foraging

3  and reproductive habitat in the long-term.  (Id. at 8563-64.)

4  Defendants weighed the short-term impacts against the long-term

5  benefits and concluded that the Harris Project would ultimately

6  help protect and increase northern spotted owl habitat.  While

7  plaintiff fundamentally disagrees that forest thinning will

8  improve forest stand resilience to fire in the long term, the

9  court must "refrain from acting as a type of omnipotent

10  scientist."  Tri-Valley CAREs v. U.S. Dep't of Energy, 671 F.3d

11  1113, 1126 (9th Cir. 2012).  The court therefore defers to the

12  government's scientific judgments and finds that the Harris

13  Project is consistent with the Recovery Plan.  See Marsh v. Or.

14  Natural Res. Council, 490 U.S. 360, 378 (1989) ("When specialists

15  express conflicting views, an agency must have discretion to rely

16  on the reasonable opinions of its own qualified experts even if,

17  as an original matter, a court might find contrary views more

18  persuasive.").

19       Recovery Action 10 also provides that the Forest

20  Service should use "the best available site-specific data" to

21  protect known northern spotted owl sites or historic sites with

22  reproductive pairs, non-reproductive pairs, and resident singles.

23  (AR at 5873.)  The Forest Service based its conclusion that the

24  Harris Project "may affect, but is not likely to adversely

25  affect, the northern spotted owl" in part on eleven activity

26  surveys that were conducted between 1996 and 2013.  (Pl.'s Mem.

27  at 11.)  The surveys found that no northern spotted owl have been

28  detected in the ST-218 home range since 1996 and the last nesting

20

in ST-222 was in 2009 and a non-reproductive pair was observed in ST-222 in 2013.  (AR at 8816.)  Plaintiff contends the surveys are not reliable scientific evidence because they were not conducted in six of the seventeen years between 1996 and 2013 and four of the eleven surveys were not conducted in accordance with FWS survey protocol.  (Pl.'s Mem. at 11.)

The court must exercise deference in reviewing an agency's determination of what constitutes the best scientific data available.  San Luis & Delta-Mendota Water Auth. v. Jewell, 747 F.3d 581, 602 (9th Cir. 2014).  The "best scientific . . . data available, does not mean the best scientific data possible." Id. (citation omitted).  Even if four of the eleven surveys did not comply with FWS protocol, the surveys for the past seven continuous years were all performed using an FWS protocol and consistently demonstrated the northern spotted owl was not occupying ST-218.  (AR at 8846.)  Moreover, plaintiff fails to establish that the Forest Service ignored any superior scientific evidence regarding the presence of the northern spotted owl in the Harris Project area.  See Jewell, 747 F.3d at 602 ("The best available data requirement merely prohibits [an agency] from disregarding available scientific evidence that is in some way better than the evidence [it] relies on." (citation omitted) (alteration in original)).

Lastly, despite the survey evidence that the northern spotted owl has not been present in ST-218 in recent years, no treatment will occur in the cores of the two known ST-218 or ST-222 home ranges and 97% of the foraging habitat in the ST-218 home range, 66% of the dispersal habitat in the ST-218 home

1  range, all foraging habitat in the ST-222 home range, and 80% of

2  dispersal habitat in the ST-222 home range will be left

3  untreated.  (AR at 8816.)  In addition, potential disturbances to

4  the northern spotted owl will be minimized by implementing

5  Limited Operating Periods for habitat altering, smoke generating,

6  and noise generating activities above ambient levels if nesting

7  or single northern spotted owls are detected within 0.25 miles of

8  treatment activities.  (Id. at 8816, 8862.)  Thus, the Harris

9  Project will protect large portions of the ST-218 and ST-222 home

10  ranges in accordance with the Recovery Plan, which requires

11  protection of both "currently occupied as well as historically

12  occupied" northern spotted owl habitat.  (Id. at 31341.)

13         The court must therefore find that the Harris Project

14  is consistent with the northern spotted owl Recovery Plan's

15  recommendations and the Forest Service relied on the best

16  scientific evidence available.  Accordingly, the court must deny

17  plaintiff's motion for summary judgment on its ESA claims against

18  the Forest Service and grant defendants' motion.

19         The court must also find that the FWS did not violate

20  the ESA by concurring in the Forest Service's BA finding of "no

21  adverse effect" on the northern spotted owl.  The FWS concurred

22  in the BA after holding several team meetings that included

23  biologists from the Forest Service and the FWS.  (Id. at 4055.)

24  The FWS also conducted an independent review and analysis of the

25  project, including information in the BA, several site visits,

26  the Recovery Plan, the Final NSO Critical Habitat Rule, available

27  peer-reviewed scientific literature, information in the EIS, and

28  additional information and clarification from the Forest Service

1  pertaining to the Harris Project.  (Id. at 4056.)  The FWS

2  clearly articulated a reasonable connection between the facts

3  found and its concurrence in the Forest Service's determination

4  that the Harris Project is not likely to adversely affect the

5  northern spotted owl.  The court must therefore deny plaintiff's

6  motion for summary judgment on its ESA claim against the FWS and

7  grant defendants' motion.

8       E. National Forest Management Act Claims

9          Plaintiff concludes by arguing that in failing to

10  comply with the Recovery Plan defendants also violated NFMA.

11  Under NFMA, the Forest Service must develop a forest plan for

12  each unit of National Forest System.  16 U.S.C. § 1604(a).  After

13  a forest plan is developed, all subsequent agency action,

14  including site-specific plans such as the Harris Project, must

15  comply with NFMA and be consistent with the governing forest

16  plan.  Id. at § 1604(i); see also The Lands Council v. McNair,

17  537 F.3d 981, 988-89 (9th Cir. 2008).  In this case, the Shasta-

18  Trinity National Forest land and resource management plan

19  provides that the Forest Service must "maintain and/or enhance

20  habitat for" threatened, endangered, and sensitive "species

21  consistent with individual species recovery plans."  (AR at

22  11112.)  The forest plan therefore incorporates the northern

23  spotted owl Recovery Plan.  As discussed above, see supra II.D.2,

24  the Harris Project is consistent with the northern spotted owl

25  Recovery Plan and Recovery Action 10.  Accordingly, the court

26  must find that defendants did not violate NFMA or the forest

27  plan.

28       For all of the foregoing reasons, IT IS THEREFORE

1    ORDERED that plaintiff's motion for summary judgment (Docket No.

2    32) be, and the same hereby is, DENIED and defendants' motion

3    (Docket No. 41) be, and the same hereby is, GRANTED.

4    Dated:   February 23, 2016

5

6    WILLIAM B. SHUBB
     UNITED STATES DISTRICT JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28