UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

CONSERVATION CONGRESS,

    Plaintiff,

  v.

UNITED STATES FOREST SERVICE,
and UNITED STATES FISH AND
WILDLIFE SERVICE,

    Defendants.

CIV. NO. 2:15-00249 WBS AC

MEMORANDUM AND ORDER RE: MOTION
FOR ATTORNEY'S FEES

----oo0oo----

    Plaintiff Conservation Congress brought this action against the United States Forest Service ("Forest Service") and the United States Fish and Wildlife Service ("FWS"), alleging that defendants violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347, the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544, the National Forest Management Act of 1976 ("NFMA"), 16 U.S.C. §§ 1600-1614, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, in

1

approving the Harris Vegetation Management Project ("Harris Project") in the Shasta-Trinity National Forest.  In October 2015, after plaintiff had initiated its lawsuit, the Forest Service voluntarily reinitiated ESA section 7 consultation on the potential impacts of the Harris Project on the gray wolf and prepared a BA Addendum finding the Harris Project "may affect, but is not likely to adversely affect" the gray wolf, and the FWS concurred.  (Myers Decl. ¶ 18 (Docket No. 54).)  Both parties agreed that plaintiff's gray wolf ESA claims were mooted by this voluntary action and, as a result, the court dismissed the two ESA claims as moot.  (Pl.'s Reply to Mot. for Summ. J. at 2 (Docket No. 27); Defs.' Mot. for Summ. J. at 13 (Docket No. 41-1); Feb. 23, 2016 Order at 15-16 (Docket No. 49).)  The court granted summary judgment in favor of defendants on the remaining claims.  (Feb. 23, 2016 Order.)

Plaintiff now argues it was successful on its ESA claims regarding the gray wolf under the catalyst theory and requests attorney's fees and costs pursuant to section 11(g)(4) of the ESA, 16 U.S.C. § 1540(g)(4).  (Pl.'s Notice of Mot. & Mot. for Att'y's Fees ("Pl.'s Mot.") (Docket No. 51).)

The ESA citizen suit provision provides that a court "may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate."  16 U.S.C. § 1540(g)(4).  This "whenever appropriate" language "'was meant to expand the class of parties eligible for fee awards from prevailing parties to partially prevailing parties--parties achieving some success, even if not major success.'"  Ass'n of Cal. Water Agencies v.

2

1    _Evans_, 386 F.3d 879, 885 (9th Cir. 2004) (quoting _Ruckelhaus v._

2    _Sierra Club_, 463 U.S. 680, 688 (1983) (interpreting the Clean Air

3    Act's identical fee-shifting provision)).  In statutes that

4    provide for fee shifting "whenever appropriate," Congress

5    intended for a plaintiff to be able to recover attorney's fees if

6    its suit furthered the goals of the statute or forced a defendant

7    to abandon illegal conduct, even if there was no formal court

8    order.  See _Ass'n of Cal. Water Agencies_, 386 F.3d at 885.

9         When a plaintiff does not win a final judgment on the

10   merits, the two-part "catalyst theory" test determines whether

11   that plaintiff nonetheless prevailed for the purpose of receiving

12   attorney's fees.  The district court must determine that (1) the

13   lawsuit accomplished, at least in part, what it sought to

14   accomplish and there was a "'clear, _causal relationship_ between

15   the litigation brought and the practical outcome realized,'" and

16   (2) "'the benefit achieved was required by law and was not a

17   gratuitous act of the defendant.'"  _Id._ at 885-86 & n.3 (citation

18   omitted).

19        In this case, plaintiff achieved some success even

20   though its ESA claims regarding the gray wolf were dismissed as

21   moot.  In its Second Amended Complaint ("SAC"), plaintiff alleged

22   that the Forest Service failed to adequately analyze the

23   potential for adverse effects of the Harris Project on the gray

24   wolf and that its finding of "no effect" was arbitrary and

25   capricious.  (SAC ¶¶ 92-97 (Docket No. 10).)  Plaintiff also

26   claimed the FWS improperly concurred in the Forest Service's

27   analysis.  (_Id._ ¶¶ 104-09.)  Plaintiff requested that the court

28   declare that defendants violated the ESA, vacate and remand the

3

1   BA and FWS Concurrence Letter, and enjoin timber harvest in the

2   Harris Project until defendants complied with the ESA.  (<u>Id.</u>

3   ¶¶ 115-16.)

4          In its voluntarily prepared BA Addendum, the Forest

5   Service conducted a more detailed analysis of the potential

6   effects on the gray wolf and changed its finding of "no effect"

7   to "may affect, but is not likely to adversely affect."  (Myers

8   Decl. ¶ 18.)  It, in essence, vacated its prior BA with respect

9   to the gray wolf by preparing this supplemental analysis.

10  Further, the Forest Service reinitiated consultation with the FWS

11  and the FWS issued a new letter of concurrence.  While plaintiff

12  did not receive a judgment finding defendants had violated the

13  ESA, plaintiff received most of the benefits it was seeking in

14  its ESA claims as to the gray wolf.  <u>See</u> <u>Greater L.A. Council on</u>

15  <u>Deafness v. Cmty. Television of S. Cal.</u>, 813 F.3d 217, 220 (9th

16  Cir. 1987) (finding that "[p]laintiffs need only have received

17  some of the benefits they sought in the suit" to be a prevailing

18  party for the purpose of receiving attorney's fees under the

19  Rehabilitation Act).  Accordingly, the lawsuit accomplished, at

20  least in part, what it sought to accomplish.

21         The question remaining is whether there is a "'clear,

22  causal relationship between the litigation brought and the

23  practical outcome realized.'"  <u>See</u> <u>Ass'n of Cal. Water Agencies</u>,

24  386 F.3d at 886 (citation omitted) (emphasis omitted).  The Ninth

25  Circuit has found that the test "inquires whether the suit was at

26  least a material factor or played a catalytic role in bringing

27  about the desired result."  <u>Or. Envtl. Council v. Kunzman</u>, 817

28  F.2d 484, 497 (9th Cir. 1987) (citation and internal quotation

4

1  marks omitted).

2        "[C]hronological events are important, although not a

3  definitive factor, in determining whether or not a defendant can

4  be reasonably inferred to have guided his actions in response to

5  a plaintiff's lawsuit."  <u>Braafladt v. Bd. of Governors of Or.</u>

6  <u>State Bar Ass'n</u>, 778 F.2d 1442, 1444 (9th Cir. 1985) (affirming

7  the district court's finding of no causal connection where an

8  earlier suit had already raised similar constitutional questions

9  and prompted the Oregon Supreme Court to act).  "Clues to the

10  provocative effects of the plaintiffs' legal efforts are often

11  best gleaned from the chronology of events" given that

12  "defendants, on the whole, are usually rather reluctant to

13  concede that the litigation prompted them to mend their ways."

14  <u>Sablan v. Dep't of Fin. of the Commonwealth of the N. Mariana</u>

15  <u>Islands</u>, 856 F.2d 1317, 1326 (9th Cir. 1988) (citation omitted).

16        "'Whether a litigant has shown a sufficient causal

17  relationship between the lawsuit and the practical outcome

18  realized is a pragmatic factual inquiry for the district court.'"

19  <u>Sw. Ctr. for Biological Diversity, Cal. Native Plant Soc.</u>, 182 F.

20  Supp. 2d at 950 (citation omitted).  "[C]redibility choices in

21  the resolution of conflicting testimony are the district court's

22  province as fact finder."  <u>Sablan</u>, 865 F.2d at 1326 (citation

23  omitted).

24        For example, in <u>Association of California Water</u>

25  <u>Agencies</u>, the Ninth Circuit affirmed the district court's award

26  of attorney's fees to the plaintiffs even though the case was

27  rendered moot when the government settled a separate but related

28  case and voluntarily remanded the critical habitat designations

plaintiffs were challenging under the ESA.  Id. at 881-82.  The
Ninth Circuit concluded that it was reasonable for the district
court to find that the plaintiffs' complaint and imminent summary
judgment proceedings were a catalyst, especially considering that
the plaintiffs' action was the first to challenge this approach
to critical habitat designations.  Id. at 886.  The chronology
established a causal relationship because the government began
considering a voluntary remand after the district court set the
filing date for cross-motions for summary judgment.  The
government decided to go forward with the voluntary remand only
two weeks before the summary judgment deadline and after the
district court found the plaintiffs' had standing and suggested
that the evidence supported the plaintiffs' claim.

Likewise, in Southwest Center for Biological Diversity,
California Native Plant Society v. Carroll, 182 F. Supp. 2d 944
(C.D. Cal. 2001), the court found that the evidence indicated
that the plaintiffs' ESA claims regarding two endangered plant
species "played an active role in the process that culminated in"
the BA.  Id. at 951.  The government relied exclusively on a
declaration that glossed over critical facts from the chronology
and made no reference to the administrative record to argue that
plaintiffs' suit had no impact on its decision to create a BA.
Id.  The court found that, despite the government's
representations, it was clear from the full record that the
government agreed to a date for the issuance of the BA, included
an analysis of the two endangered plant species in its BA, and
even adopted the environmental baselines that the plaintiffs had
argued were appropriate only after several rounds of settlement

1  discussions with the plaintiffs.  Id.  The court thus found that

2  the plaintiffs' suit and subsequent settlement discussions were

3  the catalyst and the plaintiffs were the prevailing party for the

4  purposes of attorney's fees.

5         In this case, plaintiff relies on the chronology of

6  events to argue that defendants reinitiated informal consultation

7  and issued a BA Addendum because of its pending lawsuit.  (Pl.'s

8  Mot. at 5-8; Pl.'s Reply at 6-8 (Docket No. 58).)  Plaintiff

9  filed its SAC, adding the ESA gray wolf claims, on May 5, 2015.

10  This was, according to plaintiff, the first suit to challenge a

11  Forest Service project in California for failing to fully analyze

12  a project's effects on the gray wolf.  On May 18, 2015, this

13  court issued a Status (Pretrial Scheduling) Order setting August

14  17, 2015 as the deadline for plaintiff's summary judgment motion

15  (although the parties later stipulated to extend the deadline to

16  November 6, 2015).  Plaintiff filed its motion to admit extra-

17  record evidence regarding the ESA wolf claims on August 31, 2015.

18  In October 2015, the Forest Service finalized its BA Addendum and

19  the FWS concurred, effectively mooting plaintiff's ESA claims.

20  Plaintiff argues that, as in Association of California Water

21  Agencies, defendants voluntarily reinitiated consultation because

22  the deadline for plaintiff's summary judgment motion was

23  approaching and plaintiff's motion to admit extra-record evidence

24  related to the gray wolf was pending.

25         Defendants, however, offer a different explanation for

26  this same sequence of events.  David R. Myers, the Forest

27  Supervisor for the Shasta-Trinity National Forest who is

28  responsible for assuring compliance with section 7 of the ESA and

7

1  for the decision authorizing the Harris Project, represents that

2  plaintiff's lawsuit "did not influence the Forest Service's

3  decision to prepare a BA Addendum and reinitiate informal

4  consultation with the FWS on the Harris Project's anticipated

5  effects on the gray wolf."  (Myers Decl. ¶ 5.)  Instead, he

6  explains that the Forest Service reinitiated consultation because

7  of two press releases issued by the California Department of Fish

8  and Wildlife ("CDFW") in August 2015.  (Id. ¶¶ 13-18.)

9         The first press release on August 3, 2015 stated that

10  the CDFW had collected evidence of at least one wolf in Siskiyou

11  County.  A biologist had spotted large canid tracks and a remote

12  trail camera photographed a large canid that CDFW believed to be

13  a lone gray wolf.  (Id. ¶ 13; see also Myers Decl. Attach. A

14  (Docket No. 54-1).)  On August 20, 2015, the CDFW issued a second

15  press release announcing the confirmed presence of seven gray

16  wolves in northern California, including the adult previously

17  photographed on August 3, 2015.  (Myers Decl. ¶ 14; see also

18  Myers Decl. Attach. B (Docket No. 54-2).)  The press release

19  designated this group of two adults and five pups as the "Shasta

20  Pack" and noted that the presence of the pack was exciting news

21  for California, which has had no wolves, aside from OR7 who had

22  already returned to Oregon, since 1924.  (Id.)  Based on these

23  two press releases, the Forest Service prepared a Consideration

24  of New Information and ultimately decided to reinitiate informal

25  consultation.  (Myers Decl. ¶ 15.)

26         Plaintiff argues that the CDFW news releases were not

27  "new information" that triggered a requirement to reinitiate

28  consultation because the Forest Service already knew that OR7 had

1  traveled near the project area. (Pl.'s Mot. at 9.) Based on

2  this information alone, plaintiff contends, the Forest Service

3  was required under the ESA to fully analyze the effects of the

4  Harris Project on the gray wolf. (Id.) It seems clear to the

5  court, however, that the press releases about seven newly

6  discovered wolves present in northern California provided new

7  information distinct from information about one wolf that had

8  briefly passed through California but already returned to Oregon.

9         Plaintiff also attacks the reliability of Myers'

10  declaration, contending that he "lacks the necessary personal

11  knowledge to state that Plaintiff's lawsuit 'did not influence'

12  the Forest Service's decision-making process" because he does not

13  have "personal knowledge of all discussions among Forest Service

14  staff regarding the lawsuit." (Pl.'s Reply at 10.) Plaintiff

15  offers two Forest Service emails that allegedly demonstrate that

16  it is "simply not possible for Mr. Myer [sic] or anybody else to

17  categorically state as a fact that, 'the Forest Service's

18  decision to reinitiate consultation was entirely unrelated to

19  Plaintiff's lawsuit.'" (Id. at 13.) In the first e-mail, a

20  Shasta-Trinity National Forest environmental coordinator wrote an

21  FWS employee acknowledging that they had received plaintiff's

22  complaint and the FWS employee responded that the "wolf issue was

23  NOT included in complaint." (Id. at 11, Ex. 1.) The second was

24  sent by a Shasta-Trinity National Forest biologist on August 27,

25  2015--shortly after the CDFW press releases--to a Shasta-Trinity

26  National Forest environmental coordinator and copied an attorney

27  from the Office of General Counsel. The email reported that she

28  had "begun discussing the new information on the Shasta Pack with

1   the [Office of General Counsel], as well as the FWS and Klamath

2   National Forest" and had formulated a "general approach for

3   addressing the new information for the Porcupine and Harris

4   projects that are in active litigation." (Id. Ex. 2.)  Plaintiff

5   contends the emails demonstrate that individuals within the

6   Forest Service were taking into consideration plaintiff's suit in

7   deciding how best to handle the information about the Shasta Pack

8   and Myers' categorical assertion to the contrary is not credible.

9        Defendants have therefore submitted Myers' declaration

10  as direct evidence that plaintiff's suit did not play a role in

11  its decision to reinitiate consultation while plaintiff has

12  presented both the chronology of events and the internal Forest

13  Service emails as circumstantial evidence that its suit was in

14  fact a catalyst.  When required to consider the catalyst theory,

15  as the court is under the ESA, and faced with two conflicting

16  versions of events, the court cannot undertake the factbound

17  inquiry necessary to determine which party is more credible based

18  solely on the contradicting pleadings and declarations.  As the

19  Supreme Court noted in Buckhannon Board & Care Home, Inc. v. West

20  Virginia Department of Health & Human Resources, 532 U.S. 598,

21  609 (2001), in finding the catalyst theory was not a permissible

22  basis for the award of attorney's fees under the Fair Housing

23  Amendments Act of 1988 and the Americans with Disabilities Act of

24  1990, "a 'catalyst theory' hearing would require analysis of the

25  defendant's subjective motivations in changing its conduct, an

26  analysis that 'will likely depend on a highly factbound inquiry

27  and may turn on reasonable inferences from the nature and timing

28  of the defendant's change in conduct.'"  Id. (citation omitted).

1    An evidentiary hearing will enable the court to listen
2    to the witnesses' testimony, observe their demeanor, assess their
3    credibility, and resolve the disputed issues of fact regarding
4    defendant's motivations based on the totality of the evidence.
5    See, e.g., Sablan v. Dep't of Fin. of the Commonwealth of the N.
6    Mariana Islands, 856 F.2d 1317, 1322 (9th Cir. 1988) (explaining
7    that "the purpose of an evidentiary hearing is to resolve
8    disputed issues of fact" and finding that "[f]ee awards therefore
9    need not be preceded by an evidentiary hearing if the record and
10   supporting affidavits are sufficiently detailed to provide an
11   adequate basis for calculating an award"); Kilgour v. City of
12   Pasadena, 53 F.3d 1007, 1009 (9th Cir. 1995), abrogated on other
13   grounds by Buckhannon, 532 U.S. at 601-02 (noting that the trial
14   court concluded after an evidentiary hearing that the plaintiff
15   was not a significant catalyst); Iranian Students Ass'n v.
16   Sawyer, 639 F.2d 1160, 1163-64 (5th Cir. 1981) (remanding for an
17   evidentiary hearing to determine whether the plaintiff's lawsuit
18   was a significant catalyst because the chronology of events was a
19   factor to consider but not definitive and the contradicting
20   pleadings and affidavits were insufficient evidence for the court
21   to determine which party's argument was more plausible); cf.
22   Graham v. DaimlerChrysler Corp., 34 Cal. 4th 553, 576-77 (2004)
23   ("When a lawsuit has been mooted by a defendant's change in
24   conduct, some development of the factual record is required in
25   order to prevail on a catalyst theory. . . . When the suit is
26   mooted early in its prosecution (as occurred in the present
27   case), it may generally be established during the attorney fee
28   proceeding by declarations, or, at the discretion of the trial

11

1   court, by an abbreviated evidentiary hearing."); <u>Coal. for a</u>

2   <u>Sustainable Future in Yucaipa v. City of Yucaipa</u>, 238 Cal. App.

3   4th 513, 521 (4th Dist. 2015) (same).  To the extent that other

4   courts have decided similarly disputed issues of fact on the

5   record alone, this court disagrees.  Accordingly, the court will

6   decide plaintiff's motion for attorney's fees only after holding

7   an evidentiary hearing.

8         This matter is therefore set for evidentiary hearing in

9   accordance with this Order on June 28, 2016 at 9:00 a.m. in

10   Courtroom No. 5 of this court.  Counsel shall be prepared to call

11   the witnesses and present the documentary evidence in support of

12   their respective positions on the issue of whether plaintiff is

13   entitled to attorney's fees on a catalyst theory.

14         IT IS SO ORDERED.

15   Dated:   June 2, 2016

16         WILLIAM B. SHUBB

17         UNITED STATES DISTRICT JUDGE

12