UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

| | |
|---|---|
| CONSERVATION CONGRESS,<br><br>    Plaintiff,<br><br>    v.<br><br>UNITED STATES FOREST SERVICE, and UNITED STATES FISH AND WILDLIFE SERVICE,<br><br>    Defendants. | CIV. NO. 2:15-00249 WBS AC<br><br><u>MEMORANDUM AND ORDER RE: MOTION FOR ATTORNEY'S FEES</u> |

----oo0oo----

        Plaintiff Conservation Congress brought this action against the United States Forest Service ("Forest Service") and the United States Fish and Wildlife Service ("FWS"), alleging that defendants violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347, the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544, the National Forest Management Act of 1976 ("NFMA"), 16 U.S.C. §§ 1600-1614, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, in

1

approving the Harris Vegetation Management Project ("Harris Project") in the Shasta-Trinity National Forest.  In October 2015, after plaintiff had initiated its lawsuit, the Forest Service voluntarily reinitiated ESA section 7 consultation on the potential impacts of the Harris Project on the gray wolf and prepared a BA Addendum finding that the Harris Project "may affect, but is not likely to adversely affect" the gray wolf, and the FWS concurred.  (Myers Decl. ¶ 18 (Docket No. 54).)  Both parties agreed that plaintiff's gray wolf ESA claims were mooted by this voluntary action and, as a result, the court dismissed the two ESA claims.  (Pl.'s Reply to Mot. for Summ. J. at 2 (Docket No. 27); Defs.' Mot. for Summ. J. at 13 (Docket No. 41-1); Feb. 23, 2016 Order at 15-16 (Docket No. 49).)  The court granted summary judgment in favor of defendants on the remaining claims.  (Feb. 23, 2016 Order.)

In March 2016, plaintiff moved for attorney's fees and costs pursuant to section 11(g)(4) of the ESA, 16 U.S.C. § 1540(g)(4), arguing that it was the prevailing party on its gray wolf ESA claims for the purposes of receiving attorney's fees under the catalyst theory.  (Pl.'s Notice of Mot. & Mot. for Att'y's Fees ("Pl.'s Mot.") (Docket No. 51).)  As the court explained in its June 2, 2016 Order, an evidentiary hearing was necessary to determine whether plaintiff's lawsuit was a catalyst because the court could not undertake the factbound inquiry necessary to determine which party was more credible based solely on the contradicting pleadings and declarations.  (June 2, 2016 Order at 12 (Docket No. 60).)  The court held an evidentiary hearing on July 28, 2016.

1         The ESA citizen suit provision provides that a court
2   "may award costs of litigation (including reasonable attorney and
3   expert witness fees) to any party, whenever the court determines
4   such award is appropriate."  16 U.S.C. § 1540(g)(4).  This
5   "whenever appropriate" language "'was meant to expand the class
6   of parties eligible for fee awards from prevailing parties to
7   partially prevailing parties--parties achieving some success,
8   even if not major success.'"  Ass'n of Cal. Water Agencies v.
9   Evans, 386 F.3d 879, 885 (9th Cir. 2004) (quoting Ruckelhaus v.
10  Sierra Club, 463 U.S. 680, 688 (1983) (interpreting the Clean Air
11  Act's identical fee-shifting provision)).
12        When a plaintiff does not win a final judgment on the
13  merits, the two-part "catalyst theory" test determines whether
14  that plaintiff nonetheless prevailed for the purpose of receiving
15  attorney's fees.  The district court must determine that (1) the
16  lawsuit accomplished, at least in part, what it sought to
17  accomplish and there was a "'clear, causal relationship between
18  the litigation brought and the practical outcome realized,'" and
19  (2) "'the benefit achieved was required by law and was not a
20  gratuitous act of the defendant.'"  Id. at 885-86 & n.3 (citation
21  omitted).[1]
22        In deciding whether there is a clear, causal
23  relationship between the litigation brought and the practical
24  outcome realized, the court "inquires whether the suit was at

---

25     [1]   In its June 2, 2016 Order, this court found that
26  plaintiff received most of the benefits it was seeking in its ESA
    claims as to the gray wolf but left undecided the question of
27  whether there was a clear causal relationship between the
    litigation brought and benefits obtained.  (June 2, 2016 Order at
28  3-4.)

3

least a material factor or played a catalytic role in bringing about the desired result." Or. Envtl. Council v. Kunzman, 817 F.2d 484, 497 (9th Cir. 1987) (citation and internal quotation marks omitted). While the litigation need not be the "sole cause" of the outcome, it must at least be a "contributing factor." Id. (citing Am. Constitutional Party v. Munro, 650 F.2d 184, 187 (9th Cir. 1981)). "'At a minimum, the lawsuit must have been a catalyst that prompted the opposing party to take action.'" Id. (citation omitted); see also McQuiston v. Marsh, 790 F.2d 798, 801 (9th Cir. 1986) (upholding a finding that the plaintiff was not a prevailing party when the district court "specifically found that no causal nexus existed between" the lawsuit and the defendant's action and that his lawsuit "did not prompt" the defendant's action); Harris v. McCarthy, 790 F.2d 753, 759 (9th Cir. 1986) ("A district court may award attorney's fees to a plaintiff whose suit has prompted defendants to take action to satisfy his demands."); Am. Constitutional Party, 650 F.2d at 188 ("[T]he causal relation between the lawsuit and the relief received 'must be more than simple knowledge that litigation may occur.'" (citation omitted)).

"[C]hronological events are important, although not a definitive factor, in determining whether or not a defendant can be reasonably inferred to have guided his actions in response to a plaintiff's lawsuit." Braafladt v. Bd. of Governors of Or. State Bar Ass'n, 778 F.2d 1442, 1444 (9th Cir. 1985) (affirming the district court's finding of no causal connection where an earlier suit had already raised similar constitutional questions and prompted the Oregon Supreme Court to act); see also Sablan v.

1  Dep't of Fin. of the Commonwealth of the N. Mariana Islands, 856
2  F.2d 1317, 1326 (9th Cir. 1988) ("Clues to the provocative
3  effects of the plaintiffs' legal efforts are often best gleaned
4  from the chronology of events.").
5         "'Whether a litigant has shown a sufficient causal
6  relationship between the lawsuit and the practical outcome
7  realized is a pragmatic factual inquiry for the district court.'"
8  Sw. Ctr. for Biological Diversity, Cal. Native Plant Soc., 182 F.
9  Supp. 2d 944, 950 (C.D. Cal. 2001) (citation omitted).
10 "[C]redibility choices in the resolution of conflicting testimony
11 are the district court's province as fact finder." Sablan, 865
12 F.2d at 1326 (citation omitted).
13         For example, in American Constitutional Party v. Munro,
14 the Ninth Circuit affirmed the district court's denial of the
15 plaintiffs' motion for attorney's fees because the plaintiffs
16 failed to show that their suit played "a sufficiently influential
17 role" in the outcome.  650 F.2d at 188.  The plaintiffs filed a
18 suit challenging the constitutionality of a Washington statute
19 and the statute was amended one year later, mooting the
20 plaintiffs' complaint.  Id. at 186.  The plaintiffs nonetheless
21 moved for attorney's fees, arguing that their suit contributed to
22 the legislative action taken.  Id. at 188.  The only evidence the
23 plaintiffs submitted was an affidavit created a year after the
24 amendment from a legislator who stated that he was aware of the
25 suit during the legislative process and the suit was discussed in
26 House meetings.  Id. at 186.  The house and senate journals
27 during the months when the legislation was considered did not,
28 however, mention the plaintiffs' suit.  Id.  Moreover, there was

significant evidence in the record that amendments to the statute had been proposed and meetings with the Secretary of State had taken place for years before the plaintiffs filed their suit. Id. at 188.  Lastly, the legislator's after-the-fact affidavit was not reliable and it stated "only that the suit was 'discussed,' not that it played a causal role in passage of the amendment." Id. at 188.

In this case, the Forest Service called two Forest Service employees as witnesses at the July 28, 2016 evidentiary hearing: (1) Christine Jordan, a wildlife biologist for the Shasta-Trinity National Forest; and (2) David R. Myers, the Forest Supervisor for the Shasta-Trinity National Forest who is responsible for assuring compliance with section 7 of the ESA and for the decision authorizing the Harris Project.  Both Jordan and Myers credibly testified that while they were aware of plaintiff's suit and the claim regarding the gray wolf, the suit had no impact on the Forest Service's decision to reinitiate consultation and prepare a BA Addendum.  (See also Myers Decl. ¶ 5.)

Instead, both witnesses represented that the Forest Service reinitiated consultation because of two press releases issued by the California Department of Fish and Wildlife ("CDFW") in August 2015 about the "Shasta Pack"--a reproducing pair of wolves and five pups observed within ten to fifteen miles of the Harris Project area.  (See Myers Decl. Attach. B (Docket No. 54-2).)  Jordan testified that on August 21, 2015, a day after this significant press release, she began seeking further information about the location of the Shasta Pack, consulting with biologists

with experience with gray wolves, and preparing a Consideration of New Information.  (See Second Ogden Decl. Ex. 1 at 81, Consideration of New Info. (Docket No. 36).)  The Shasta Pack's presence was important new information, according to Jordan, because it was the first evidence of a breeding pack of gray wolves, an endangered species, in California in a hundred years. Jordan explained that the earlier presence of OR7, a radio-collared lone wolf, was very different as he had already returned to Oregon, was not reproducing, and lone wolves often rove hundreds of miles.

Jordan recommended that the Forest Service reinitiate consultation with the FWS because of the proximity of the Shasta Pack detection area to the Harris Project; the suitable potential habitat within the Harris Project area for both dens and rendezvous sites--large, grassy, meadow areas where adults take pups after leaving the den; and the possible disturbance that ongoing Harris Project activity could cause to the wolves. Project activity thus far had involved the operation of loud, heavy logging equipment in order to cut down trees and pile wood. Jordan testified that her decision to recommend reinitiation of consultation was therefore "purely based on biology"--the appearance of this new endangered species within close proximity to an active project area--and plaintiff's suit did not influence her decision in any way.

Myers, the deciding officer on the Harris Project, also testified that his decision to adopt Jordan's recommendation and reinitiate consultation was in no way influenced by plaintiff's suit.  Myers had been aware of plaintiff's claims regarding the

gray wolf since plaintiff had filed its First Amended Complaint, three-and-a-half months prior to the Shasta Pack press releases. Myers did not decide to reinitiate consultation during this time. Instead, Myers decided to reinitiate consultation only after receiving the "extremely important" news of the Shasta Pack and the recommendation of his biologist.

Myers stated that there was pressure to quickly reinitiate consultation and examine the impacts of the Harris Project on the gray wolf because the Harris Project logging was ongoing and the project was in close proximity to the Shasta Pack detection area and had the potential to disturb the wolves. According to Myers, the approaching November 6, 2015 summary judgment deadline in plaintiff's case did not, as plaintiff suggested, drive the expedited timeline. Myers testified that he does not even recall being aware of the summary judgment deadline when he was conferring with the FWS about a quick turnaround and securing a letter of concurrence by October 2015. (See Third Suppl. Ogden Decl. Ex. 2-K.) This makes sense to the court, considering all of the other, more pressing, matters Myers testified he had to attend to at the time, as well of the fact that Myers is not a lawyer.

Furthermore, both Myers and Jordan testified that it is not unusual for the FWS to issue a letter of concurrence within a week or two of receiving a BA Addendum because the FWS is already familiar with the project and has generally been working with the Forest Service to develop the project for some time already.

Plaintiff did not call any of its own witnesses but rather attempted to highlight in its cross-examination of Jordan

1    and Myers their coordination with the Office of General Counsel
2    and the chronology of events to demonstrate that its suit played
3    a role in the Forest Service's decision to reinitiate
4    consultation.  For example, plaintiff questioned Jordan about a
5    high priority email she sent out shortly after the press releases
6    notifying other Forest Service employees and Ritu Ahuja, the
7    assigned counsel in the Office of General Counsel, that she was
8    developing a general approach for addressing the new information
9    on the Shasta Pack "for the Porcupine and Harris Projects that
10   are in active litigation."  (Second Suppl. Ogden Decl. Ex. 2
11   (emphasis added).)  Similarly, plaintiff asked Jordan about a
12   September 2015 email to her line officer, Carolyn Napper,
13   summarizing a conversation Jordan had had with Ahuja, (Third
14   Suppl. Ogden Decl. Ex. 2-D), and another informing Myers that
15   Jordan and Emelia Barnum, the supervisory natural resource
16   planner on the Shasta-Trinity National Forest unit, had
17   "continued to work with Ritu [Ahuja] on the process for
18   documenting the presence of the wolf and the pups somewhere
19   around the unit."  (Id. Ex. 2-F.)  In response to this line of
20   questions, Jordan explained that she was in touch with Ahuja to
21   keep her and the Office of General Counsel up to date on how the
22   Forest Service planned to handle the new information regarding
23   the Shasta Pack.  She was familiar with plaintiff's suit and the
24   claims alleged but this did not impact her recommendation.
25              Plaintiff also argued that the Forest Service's
26   decision to reinitiate consultation on the Harris Project but not
27   the Porcupine Project, which is also within foraging range from
28   the Shasta Pack detection area, demonstrates the impact of its

suit.  Jordan, however, testified that she did not complete a Consideration of New Information, recommend that the Forest Service reinitiate consultation, or prepare a BA Addendum on the Porcupine Project because it was farther away from the Shasta Pack detection area and has no suitable habitat for gray wolves.  The Porcupine Project has no water, open lava rock, and little to no prey or forage base for gray wolves.  In contrast, the Harris Project has springs, areas with higher elevation, buttes with large fir and pine trees, and grassy areas.  The different habitats within the Porcupine and Harris projects, Jordan testified, warranted different approaches.

     After listening to the witnesses' testimony, observing their demeanor, and reviewing the declarations and email evidence submitted, the court finds Jordan and Myers' testimony to be credible.  No one can better assess Jordan's thought process in recommending reinitiation of consultation or Myers' in accepting this recommendation than the two individuals themselves.  In addition, the court did not detect from their testimony any motivation to lie about whether plaintiff's suit influenced them.  The witnesses are not personally responsible for paying plaintiff's attorney's fees and would not therefore suffer any financial harm from acknowledging plaintiff's suit was a catalyst.  Further, it could even be in both witnesses' best interests to acknowledge that they carefully considered plaintiff's claims and changed their course of action in part because of plaintiff's allegations.  Nonetheless, both unequivocally denied being influenced by the suit and persuasively testified that the Forest Service reinitiated

1  consultation because of a clear intervening event--new
2  information about a reproducing pack of gray wolves in
3  California.
4          Further, while the Office of General Counsel was
5  included in discussions of the Shasta Pack and kept up-to-date on
6  the Forest Service's consultation process, this does not
7  demonstrate that plaintiff's suit was a catalyst to the Forest
8  Service's decision.  There is an important distinction between
9  communicating with counsel because a project is in active
10 litigation as a matter of protocol and making decisions because
11 of the pending litigation.  As in <u>American Constitutional Party</u>,
12 the fact that the suit was discussed is not evidence that it
13 played a causal role.  Plaintiff failed to demonstrate that its
14 suit played even the smallest role in the outcome achieved.
15         The court therefore finds that there is no "'clear,
16 <u>causal relationship</u> between the litigation brought and the
17 practical outcome realized.'"  <u>Ass'n of Cal. Water Agencies</u>, 386
18 F.3d at 885-86.  Accordingly, the court must deny plaintiff's
19 motion for attorney's fees.
20         IT IS THEREFORE ORDERED that plaintiff's motion for
21 attorney's fees (Docket No. 51) be, and the same hereby is,
22 DENIED.
23 Dated:  June 30, 2016

                                    _____
                                    WILLIAM B. SHUBB
                                    UNITED STATES DISTRICT JUDGE